**UNITED STATES of America,**
**Appellee,**

v.

**Max T. SALAZAR, Appellant.**

**No. 409, Docket 26911.**

United States Court of Appeals
Second Circuit.

Argued June 28, 1961.

Decided Aug. 7, 1961.

Irving Younger, Asst. U. S. Atty., S. D. of New York, New York City (Robert M. Morgenthau, U. S. Atty., New York City, on the brief), for appellee.

Robert K. Ruskin, New York City, for appellant.

Before LUMBARD, Chief Judge, GOODRICH * and FRIENDLY, Circuit Judges.

LUMBARD, Chief Judge.

Max T. Salazar appeals his conviction on ten counts of an indictment charging conspiracies to violate 18 U.S. C. § 1001,[1] by taking civil service examinations for ten of his fellow post office employees and signing certain identification cards and declarations of honesty in their name.[2] There was abundant proof of Salazar's guilt, but we must reverse

* Sitting by designation.

1. Section 1001 provides:
"Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

2. Counts charging Salazar with substantive offenses with respect to each of the examinations also went to the jury which was unable to agree on them.

the conviction because certain remarks and questions of the district judge were, in combined effect, so clearly prejudicial that we cannot say that the defendant received the fair trial to which he was entitled.

Six post office employees testified that Salazar, for a fee averaging about $100, had taken their civil service examinations and an F.B.I. handwriting expert stated that samples of Salazar's handwriting matched the writing on the examination papers of these six and the other four men whom Salazar had allegedly helped.

Salazar took the stand in his own defense and denied that he had ever taken any examination except on his own behalf. He testified that he and one of the government witnesses had once had a fist fight. At this point, defense counsel asked him if he remembered the testimony of Postal Inspector Joseph Burke who had interrogated Salazar about the charges against him.[3] To a question asking whether he had heard Burke testify that he gave him a formal letter of charges preferred against him by the Post Office Department, Salazar replied that "Maybe he did." The following colloquy then took place:

"The Court: Let me ask you, Salazar—don't misinterpret my remarks, either you or the jury—but you seem to be bearing a bit of a chip on your shoulder.

"Salazar: I am not carrying—I'm sorry to interrupt you.

"The Court: I mean, you feel you want me and the jury to believe that all these people in the Post Office Department and the United States Attorney's Office, and the postal inspectors are in a gigantic conspiracy to frame you?

"Salazar: Well, let me say this: It appears that way to me, it appears that way to me. I am trying

to say a few things. All I can say is yes or no. I want—"

The judge interrupted with further comments and Salazar continued:

"There is a lot of things yet that haven't been brought to light. Now, with no reflection on my attorney, whom I have the highest respect for, plus everybody here, I want to know now, sir, is it procedure to put the defendant on the stand before he calls his witnesses?"

The judge then commented:

"Well, now, I think that that question is indicative, clearly indicative of what I said, chip-carrying, only it goes a little bit further. It is almost, Mr. Salazar, a slanderous and libelous remark."

Salazar answered:

"I don't mean it that way, sir."

The judge then carried on a running argument with Salazar pressing the point that he should rely on the judgment of his counsel as to which witnesses should be called to testify and the order in which their testimony should be presented.

The judge then commented that for the defendant to criticize his own counsel about such matters was "slandering the man in his professional conduct, and when you do that to a lawyer you are exposing yourself to a very serious situation." The defendant pointed out that the judge had misunderstood him. But the colloquy, already out of hand, went merrily along. The judge took a new tack and added "I really would feel that perhaps it was a remark as a result of pique or the result of fear, and that seems to be going through your mind, too."

After this the judge said that when Salazar thought it over he might decide that he should publicly apologize to his counsel. To this the defendant answered that there was nothing to apologize for

---

**3.** Burke's testimony was only used by the government to show that Salazar had given him specimens of his handwriting which the F.B.I. handwriting expert tes- tified he used to compare with the handwriting on the civil service examination papers.

"because I didn't mean it that way. I asked you a question; I got an answer. You are the one that is making it slanderous. Mr. Baker knows that."

The colloquy between the judge and the defendant continued as follows:

"The Court: You mean I am the one who questions his judgment?

"Salazar: That is the way you are making it sound here, sir. Now you are questioning what I said.

"The Court: Oh, yes, I am, I certainly am. But if my attempts to find out what you are thinking might by any stretch of the imagination, Mr. Baker, be considered an affront by you or an insult in any way, I certainly most humbly apologize, publicly, and a thousand times over. I had no such intention. Your client asked me a question.

"Mr. Baker: That is correct, your Honor.

"The Court: As a result of which a deluge of words gushed forth, as they did before."

A few minutes later the judge again entered the lists. The defendant commented that his lawyer had some additional evidence. Defense counsel then explained to the judge, out of the jury's hearing, that the evidence consisted of affidavits and that his client did not understand that such affidavits were not admissible.[4] The judge then undertook, in the presence of the jury, to enlighten the defendant about the use of affidavits, to which course the prosecutor quite properly objected but without success. The judge finally said "Well, there is no point in discussing it further. I see we have a legal scholar on our hands."

From this résumé of what must have taken ten or fifteen minutes, it is abundantly clear that the remarks of the judge were wholly unnecessary; they were not called for by the defendant's conduct on the stand. By attributing to Salazar the argument that the Post Office Department and the United States Attorney's Office had joined together to frame him, the judge made Salazar's eventual fate at the hands of the jury almost inevitable. For Salazar's defense was in fact that his fellow post office employees were lying and the handwriting expert confused, not that departments of the United States government had officially combined to fabricate a case against him. See the strikingly similar case of United States v. Woods, 2 Cir., 1958, 252 F.2d 334, 336. By making gratuitous and unnecessary comments which sarcastically and relentlessly discredited Salazar for questioning his counsel's judgment, the judge made Salazar's defense seem contemptible and ridiculous in the eyes of the jury.

Unprotected by his own counsel who seemed to think that he was on trial himself, the defendant could only ride out the storms which the court had provoked. Although his counsel failed in his duty to object to what occurred, it is clear that the defendant himself objected. In any event the error is plain and it was of a sort which should not be disregarded. Rule 52(b), Federal Rules of Criminal Procedure, 18 U.S.C.; Durham v. United States, 1956, 99 U.S.App.D.C. 132, 237 F.2d 760. The prejudicial effect of the remarks once they were made could not have been cured by an instruction to the jury to disregard them even if an objection had been made and the judge had attempted to cure his error.

By his unwarranted participation in the proceedings the judge denied to the defendant the fair and impartial trial to which our law entitles him. See United States v. Woods, 2 Cir., 1958, 252 F.2d 334.

As there must be a new trial, we comment briefly on appellant's con-

---

**4.** The evidence turned out to be photostats of hospital records, not affidavits. Eventually the photostats were admitted as bearing upon the defendant's claim that his wife was at a hospital on July 30, 1958 and tended to support his story that he was taking care of his children that day instead of taking an examination for a prospective post office employee.

tention that the alleged false statements and representations were not "material fact[s]" dealing with "matter[s] within the jurisdiction of any department or agency of the United States" as 18 U.S.C. § 1001 requires. We disagree. Surely nothing could be plainer than the conduct of civil service examinations by the Civil Service Commission pursuant to 5 U.S.C.A. § 632 is a matter within the jurisdiction of the Commission, an agency of the United States, and that the appointment of clerks in the Post Office Department is subject to the examinations given by the Commission pursuant to its regulation, 5 C.F.R. § 2, 301(b) made pursuant to the necessary exercise of its powers. Surely, it is equally plain that the identity of the person actually taking the examination is a fact that is material to the Civil Service Commission and the Post Office Department.

We commend counsel assigned for this appeal for his thorough and able presentation of the appellant's case.

The conviction is reversed and the case is remanded for a new trial.